[Cite as *State v. Houston*, 2017-Ohio-1122.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 16AP-157 |
| v. | : | (C.P.C. No. 15CR-2636) |
| Zachary W. Houston, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on March 28, 2017

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Barbara A. Farnbacher*, for appellee.

**On brief:** *Wolfe Van Wey & Associates, LLC*, and *Stephen T. Wolfe*, for appellant.

APPEAL from the Franklin County Court of Common Pleas

BRUNNER, J.

{¶ 1} Defendant-appellant, Zachary W. Houston, appeals a judgment of the Franklin County Court of Common Pleas, filed on February 16, 2016. He was sentenced to 30 months in prison following a jury verdict by which he was found guilty of domestic violence. We conclude that Zachary's[1] convictions were not against the manifest weight of the evidence and were supported by sufficient evidence. The evidence does not show that the prosecutor engaged in misconduct. Defense counsel was not ineffective. And, although disorderly conduct as set forth in R.C. 2917.11(A)(1) is a lesser-included offense of domestic violence as set forth in R.C. 2919.25(A), the trial court did not abuse its discretion in failing to instruct because, on the facts of this case, the jury could not have

---

[1] Because Zachary Houston and the victim, Norma Houston, share a last name we shall, for clarity, henceforth refer to each by their first name, intending no informality or disrespect.

No. 16AP-157

reasonably concluded that Zachary did not commit domestic violence. For these reasons, we affirm.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} On May 15, 2015, Zachary Houston was involved in an altercation with his wife, Norma Houston, in their house on Gilbert Street. (Jan. 19, 2016 Tr. at 28.) On June 1, 2015, a Franklin County Grand Jury indicted Zachary for one third-degree felony count of domestic violence as a result of this incident. (June 1, 2015 Indictment.) Zachary pled not guilty on June 3, 2015. (June 3, 2015 Plea Form.) The Franklin County Court of Common Pleas held a jury trial in the case on January 19 and 20, 2016. (Tr. in passim).

{¶ 3} Norma testified first in the trial. She testified that on May 15, 2015, her husband, Zachary, had been out drinking with a work friend and later went to his sister's house. (Tr. at 28-30.) Concerned that Zachary might drink too much, Norma telephoned and asked Zachary to bring the car back. *Id.* After Zachary returned home, an argument ensued. *Id.* When he would not settle himself, Norma called the police for the first time. *Id.* at 30. The police came, advised the couple to separate to give Zachary time to calm down. *Id.* at 30-31. Then they left. *Id.*

{¶ 4} Once the police left, Zachary began threatening Norma, telling her he had a gun and was going to kill her and her brothers. *Id.* at 31. She grew tired of arguing so she once again called the police and asked them to come arrest him. *Id.* The police again arrived, told her to stay away from Zachary, and again advised giving him time to calm himself. *Id.* at 31-32.

{¶ 5} Norma testified that when the police left for the second time Zachary jumped on her and began hitting her in the head and in the face with a closed fist. *Id.* at 32, 34. He also threatened to beat her brains out with a Heineken bottle and to beat her face to a pulp. *Id.* at 33. She telephoned the police for the third time. *Id.* Zachary left the home before the police arrived. *Id.* Norma spoke with the police and went to bed. *Id.* at 33-34. Sometime later, as she was lying in bed, Norma heard Zachary being arrested outside. *Id.* at 34.

{¶ 6} Three 911 telephone calls were played during trial. One is essentially silent and Norma testified that during that call Zachary seized the phone from her and destroyed it. (Tr. at 69-73; Def. Ex. 3.) In a different call, Norma told the dispatcher that Zachary had not hit her but had threatened her with a bottle. (Tr. at 35-38; State's Ex. A.)

No. 16AP-157

In another 911 recording, Norma states that Zachary hit her in the face and may possess a gun or knife. (Tr. at 39-43; State's Ex. A.) Norma identified various pictures introduced as exhibits which she said depicted the injuries she sustained, including a black eye. (Tr. at 45; State's Ex. B.) She also testified (without objection) that Zachary had been convicted and sent to prison for assaulting her on three prior occasions, July 2, 2000, November 9, 2004, and June 14, 2005. (Tr. at 49-50.) Exhibits were introduced to confirm these prior convictions. (Exs. C1-E2) (indictments/complaints and judgment entries showing previous convictions).

{¶ 7} Norma admitted that her eyes always look like they have black circles under them. (Tr. at 85). She admitted she bit Zachary on the thumb in defending herself. *Id.* at 43, 82-83. She stated that she never saw a gun and that Zachary did not threaten her with a knife. *Id.* at 43-44. Norma initially testified that she refused to speak to a defense investigator. *Id.* at 51. However, when a tape of the interaction between her and the investigator was played to refresh her memory, she admitted that she told the investigator that the prosecutor had told her not to speak to anyone about the incident. *Id.* at 64-66. After that admission, however, she explained that she did not want to speak to the investigator and essentially used the prosecutor as an excuse. *Id.* at 67-68.

{¶ 8} The next witness was a Columbus police officer. *Id.* at 102. The officer testified that she spoke to Norma at Norma's house on Gilbert Street on the night of the incident. *Id.* at 104. The officer said Norma appeared upset and relayed she had been threatened and hit by her husband. *Id.* The officer also personally observed injuries and swelling to Norma's face. *Id.* at 106.

{¶ 9} The officer admitted she had not observed a Heineken bottle or signs of drinking. *Id.* at 114. She also explained, when questioned about a report she authored known as a "lethality screen," that Norma had said "no" to the question of whether she thought Zachary might kill her. *Id.* at 110-11. Since the defense questioned the officer about the report, the trial court gave the prosecution latitude to ask further questions about the report and obtain Norma's affirmative responses to questions about other aggressive things Zachary had threatened or done on this and other occasions. *Id.* at 118-19.

No. 16AP-157

{¶ 10} Another police officer dispatched to Gilbert Street that evening testified. *Id.* at 123. When he arrived, Zachary was not present but the officer saw Zachary returning to the house around 2:00 a.m. and arrested him. *Id.* at 124. The officer testified that Zachary appeared intoxicated and was combative, but he admitted that nothing in the police reports confirmed this. *Id.* at 124-26.

{¶ 11} The final witness to testify (and the first and only witness called by the defense) was a police detective who interviewed Zachary in jail the morning of his arrest. *Id.* at 145-47. The detective testified that Zachary spoke to him voluntarily but was belligerent and excitable throughout the interview. *Id.* at 156-57. He testified that he noted a cut on Zachary's thumb but took no pictures of Zachary or any injuries. *Id.* at 153.

{¶ 12} There are certain procedural incidents that occurred at trial and are potentially relevant to Zachary's assignments of error. First, defense counsel had given to the prosecutor a summary of the failed attempt to interview Norma in an attempt to resolve the case short of trial. *Id.* at 61-62. Second, the trial court cautioned defense attorney at two points during the trial about alleged disrespectful demeanor and tone. *Id.* at 151, 154-55. Third, the trial court denied two motions acquittal made by the defense, one following the close of the prosecution's case and the other at close of all evidence. *Id.* at 141, 161-62. Finally, Zachary's defense counsel requested a jury instruction on a lesser-included offense of disorderly conduct, but the trial court denied the request, finding that the evidence could not support acquittal on the crime charged with a simultaneous conviction on the lesser offense of disorderly conduct. *Id.* at 96-101, 162-65.

{¶ 13} After the jury convicted Zachary, the trial court held a sentencing hearing on February 12, 2016. Noting Zachary's considerable prior record, the trial court sentenced him to 30 months in prison and entered judgment in the record on February 16. (Tr. at 217-28; Feb. 16, 2016 Jgmt. Entry.) Zachary now appeals.

## II. ASSIGNMENTS OF ERROR

{¶ 14} Zachary presents five assignments of error for review:

> [1.] THE APPELLANT WAS PREJUDICED BY INEFFECTIVE ASSISTANCE OF COUNSEL
>
> [2.] THE TRIAL COURT ERRED WHEN IT DECLINED TO INSTRUCT THE JURY ON THE LESSER INCLUDED OFFENSE OF DISORDERLY CONDUCT

[3.] THE APPELLANT DID NOT RECEIVE A FAIR TRIAL DUE TO PROSECUTORIAL MISCONDUCT

[4.] THE EVIDENCE PRESENTED AT TRIAL WAS INSUFFICIENT TO SUPPORT THE CONVICTIONS AND THE TRIAL COURT ERRED WHEN IT OVERRULED APPELLANT'S MOTION FOR ACQUITTAL PURSUANT TO CRIMINAL RULE 29

[5.] THE JURY'S VERDICTS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE

We address these assignments of error out of order for ease of discussion.

## III. DISCUSSION

### A. Fourth and Fifth Assignments of Error—Whether the Convictions were Supported by Sufficient Evidence or were Against the Manifest Weight of the Evidence

{¶ 15} The Supreme Court of Ohio has "carefully distinguished the terms 'sufficiency' and 'weight' * * * declaring that 'manifest weight' and 'legal sufficiency' are 'both quantitatively and qualitatively different.' " *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 10, quoting *State v. Thompkins*, 78 Ohio St.3d 380 (1997), paragraph two of the syllabus.

{¶ 16} Sufficiency is:

> "[A] term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." * * * In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law.

*Eastley* at ¶ 11, quoting *Thompkins* at 386; *Black's Law Dictionary* 1433 (6th Ed.1990). "In reviewing a record for sufficiency, '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *State v. Monroe*, 105 Ohio St.3d 384, 2005-Ohio-2282, ¶ 47, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 17} By contrast:

> Weight of the evidence concerns "the inclination *of the greater amount of credible evidence*, offered in a trial, to

> support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict * * * . Weight is not a question of mathematics, but depends on its *effect in inducing belief*."

(Emphasis sic.) *Eastley* at ¶ 12, quoting *Thompkins* at 387; *Black's* at 1594. In manifest weight analysis "the appellate court sits as a 'thirteenth juror' and disagrees with the jury's resolution of the conflicting testimony." *Thompkins* at 388, quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). " 'The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *Id.* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶ 18} As relevant to this case, the Ohio Revised Code defines the crime of domestic violence as follows:

> No person shall knowingly cause or attempt to cause physical harm to a family or household member.

R.C. 2919.25(A). Physical harm in this context means "any injury, illness, or other physiological impairment, regardless of its gravity or duration." R.C. 2901.01(A)(3). In addition, if the offender has been twice or more convicted of domestic violence or similar offenses, R.C. 2919.25(D)(4) requires that a new conviction of the offense is no longer a first-degree misdemeanor but a third-degree felony. R.C. 2919.25(D)(2) and (4).

{¶ 19} There is no dispute that Norma was Zachary's family and household member at the time of the offense. (Tr. at 28-29.) There is also no dispute that Zachary had at least two (three, in fact) prior convictions for domestic violence. (Tr. at 49-50; Exs. C1-E2) (domestic violence incidents on July 2, 2000, November 9, 2004, and June 14, 2005). The question for the jury was whether Zachary "knowingly caus[ed] or attempt[ed] to cause" Norma "any injury * * * regardless of its gravity or duration." R.C. 2919.25(A); 2901.01(A)(3).

{¶ 20} Norma testified that at one point during the argument, on the evening in question, Zachary jumped on her and began hitting her in the head and in the face with a closed fist. (Tr. at 32, 34.) Norma identified various photographs of herself that she said depicted the injuries she sustained from Zachary, including a black eye. (Tr. at 45; State's

No. 16AP-157

Ex. B.)   The evidence at trial was sufficient to support Zachary's conviction, because, "viewing the evidence in a light most favorable to the prosecution, a[] rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Monroe* at ¶ 47.

{¶ 21} As for manifest weight of the evidence, there was some evidence that was not favorable to the prosecution.  For example, the first two times Norma telephoned the police, she did not convey that the situation was critical, and she testified that she called because she was annoyed at Zachary and wanted him to be taken away.  (Tr. at 30-32.) Only after the police had twice responded to her calls but not arrested Zachary, did she allege that he had hit her.  *Id.* at 32-34.  Norma admitted that her eyes always look like they have black circles under them and the photographs do not definitively show that she sustained one or more black eyes.  *Id.* at 85; State's Ex. B.  Norma admitted she bit Zachary on the thumb alleging self-defense.  *Id.* at 43, 82-83.  While Norma alleged that Zachary had threatened her with a beer bottle and a gun, the police found no gun, beer bottles, or other evidence of drinking in the home.  *Id.* at 31, 33, 114.  Plus, Norma told police that she did not think Zachary would try to kill her.  *Id.* at 110-11.

{¶ 22} But Norma was unequivocal in her testimony that Zachary hit her in the face with his fist.  *Id.* at 32, 34.  The jury also heard Norma report this in a somewhat hysterical tone in a recorded 911 call she made shortly after the incident is alleged to have occurred.  (Tr. at 39-42; State's Ex. A.)  Norma identified various photos of herself that she said depicted the injuries she sustained from being hit by Zachary, including a black eye.  (Tr. at 45; State's Ex. B.)  A police officer testified that Norma appeared upset when they responded to her call at Zachary's and her home; the testimony (without any hearsay objection) confirmed that her complaint was that she had been threatened and hit by her husband.  *Id.* 104.  The officer testified to observing injuries and swelling to Norma's face. *Id.* at 106.  While the photographs may not conclusively show one or more exact injuries as Norma described them, jurors could find that they portrayed some swelling, redness, and blackening.  (State's Ex. B.)  Under these circumstances, we cannot say that "the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins* at 387.

{¶ 23} We overrule Zachary's fourth and fifth assignments of error.

No. 16AP-157

**B. Third Assignment of Error—Whether Prosecutorial Misconduct Deprived Zachary of a Fair Trial**

{¶ 24} "To evaluate allegations of prosecutorial misconduct, we 'must determine (1) whether the prosecutor's conduct was improper and (2) if so, whether it prejudicially affected [the defendant's] substantial rights.' " *State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, ¶ 162, quoting *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, ¶ 121. Zachary argues that the prosecutor engaged in misconduct by ordering a witness not to speak to an investigator hired by the defense. (June 9, 2016 Zachary Brief at 11-13.)

{¶ 25} A witness in Ohio has a right to refuse to submit to a pretrial interview when it is his or her own decision and he or she is not compelled by subpoena or other lawfully binding notice. *State v. Zeh*, 31 Ohio St.3d 99, 102-03 (1987). However a prosecutor may not obstruct access to a witness or advise the witness not to cooperate with the defense. *Id.*; *State v. Lundgren*, 11th Dist. No. 90-L-15-140 (Sept. 1 1993) (" 'A prosecutor should not discourage or obstruct communication between prospective witnesses and defense counsel. It is unprofessional conduct for the prosecutor to advise any person or cause any person to be advised to decline to give to the defense information which such person has the right to give.' ABA Standards for Criminal Justice, The Prosecution Function, Standard 3-3.1(c)").

{¶ 26} At trial, Norma testified on cross-examination about her decision not to talk to Zachary's defense counsel's investigator:

> Q.  * * *  Ms. Houston, do you remember when my investigator came to your house back in July?
>
> A.  Yeah.
>
> Q.  Does it sound like about July 9?
>
> A.  I don't remember. I don't know what -- I can't think of what date.
>
> Q.  I am sorry, July 7?
>
> A.  I don't know, but I remember a guy coming out.
>
> Q.  You do remember my investigator?

No. 16AP-157

> A. If he is your investigator. A guy did come to my house, and he asked could he talk to me, and I told him I didn't want to talk.
>
> Q. Okay. You told him that someone in the prosecutor's office told you not to talk to us?
>
> A. I said they told me I did not have to talk to him.
>
> Q. He asked you if you would talk, right?
>
> A. He asked me could he talk to me, and I told him no.
>
> Q. And you said that someone told you not to speak to anyone?
>
> A. They told me I did not have to talk -- they didn't tell me I couldn't talk to him. They told me I did not have to talk to him. And that is what I chose not to do, not talk to him.
>
> Q. Ms. Houston, you know that my investigator was recording that conversation, right?
>
> A. Well, if he did, I mean.
>
> Q. That is actually not what you told him?
>
> A. Well, play it.

(Tr. at 51-52.)

{¶ 27} After some discussion the recording was played outside the presence of the jury. On the recording Norma said the following:

> MALE VOICE: Good morning. Is Norma Houston here?
>
> FEMALE VOICE: Yes.
>
> MALE VOICE: Are you Norma?
>
> FEMALE VOICE: Yes.
>
> MALE VOICE: (Unintelligible) with the Franklin County Public Defender's office. I am investigating a case involving Zachary Houston.
>
> FEMALE VOICE: Yes.
>
> MALE VOICE: I understand you are in a domestic violence case.

No. 16AP-157

> FEMALE VOICE: Yes.
>
> MALE VOICE: Okay. I want to get some information from you regarding what happened.
>
> FEMALE VOICE: Who are you?
>
> MALE VOICE: I am with the Franklin County Public Defender's office.
>
> FEMALE VOICE: Okay.
>
> MALE VOICE: I am an investigator there. I work with the attorney that represents Zach on the case.
>
> FEMALE VOICE: I am not supposed to talk to no one.
>
> MALE VOICE: Okay. Did somebody tell you that?
>
> FEMALE VOICE: Yeah.
>
> MALE VOICE: Who told you you couldn't?
>
> FEMALE VOICE: My -- the prosecutor.
>
> MALE VOICE: The prosecutor. Okay. Did they tell you you couldn't talk to anybody, or it was up to you?
>
> FEMALE VOICE: Told me don't talk to nobody.
>
> MALE VOICE: Okay. Do you know the name of the prosecutor you spoke to?
>
> FEMALE VOICE: I don't know the name.

*Id.* at 64-66.

{¶ 28} After listening to the recording and apparently refreshing her memory Norma testified to explain the discrepancy as follows:

> Q. Ms. Houston, you had an opportunity to listen to the recording?
>
> A. Uh-huh.
>
> Q. In it you did say you were not supposed to speak to anyone?
>
> A. Right.

Q. Earlier you said that is not what you said, right?

A. I said that I was told that I did not have to speak to anyone. But that was my choice that day, because I don't know why you sent someone to my house. So I felt that I could say what I wanted to say and then he asked who said that. I didn't call no names because that was me speaking.

Q. So you are saying that nobody did tell you that?

A. They told me I did not have to speak to you or whoever.

Q. Okay.

A. But when he came to my door, it was my choice to say what I wanted to say. I did not call no name of nobody.

Q. I understand that, Ms. Houston. We could agree that you did say that you were told not to speak to anyone?

A. That is what I said on there.

Q. The investigator did explain to you you could talk to anyone you wanted?

A. But I didn't want to talk to him.

*Id.* at 67-68.

{¶ 29} Apparently, Norma's testimony ultimately was that she did not want to speak to the investigator and used the unnamed prosecutor as an excuse for refusing. This does not support Zachary's assignment of error of prosecutorial misconduct that the prosecutor instructed Norma not to cooperate with the defense. Because we cannot find that "the prosecutor's conduct was improper," we cannot reach the question of "whether it prejudicially affected [the defendant's] substantial rights." *Thompson* at ¶ 162.

{¶ 30} Zachary's third assignment of error is overruled.

## C. First Assignment of Error—Whether Trial Counsel was Ineffective

{¶ 31} Ineffective assistance of counsel claims are assessed using the two-pronged approach set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "First, the defendant must show that counsel's performance was deficient. * * * Second, the defendant must show that the deficient performance prejudiced the defense." *Id.* at 687. The failure to make either showing defeats a claim of ineffective assistance of counsel.

No. 16AP-157

*State v. Bradley*, 42 Ohio St.3d 136, 143 (1989), quoting *Strickland* at 697. ("[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one.").

{¶ 32} Zachary argues his counsel was ineffective in three ways. First, he argues that his counsel was ineffective because he gave the prosecution a summary of the defense investigator's attempted interview with Norma before the trial and that this was unnecessary. (Zachary Brief at 6-7.) Second, he argues that his counsel erred by asking an officer to read from her report during her testimony and this opened the door for the jury to learn of other details in the report. *Id.* at 7-8. Third, Zachary argues that his counsel's demeanor was inappropriate based on a caution from the trial judge. *Id.* at 8.

### 1. Sharing the Summary of the Investigator's Interview

{¶ 33} The trial court questioned Zachary's counsel outside the presence of the jury why he provided to the prosecutor before trial a summary of his investigator's attempt to interview Norma. Zachary's counsel responded:

> Maybe it was a lapse in judgment, Your Honor. Believe me, I will not be providing them in the future, but maybe it was a gesture of good will at the time, because I was trying to advance this case and resolve it short of a trial, and considering the questioning that I am getting into, I thought maybe that would help, the state could see what my investigator talked about.

(Tr. at 61-62.)

{¶ 34} "In evaluating counsel's performance, 'a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances the challenged action "might be considered sound trial strategy." ' " *State v. Roush*, 10th Dist. No. 12AP-201, 2013-Ohio-3162, ¶ 37, quoting *Strickland* at 689; *Michel v. Louisiana*, 350 U.S. 91, 101 (1955). Providing the investigative summary before trial could have been a "lapse in judgment" so as to allow the prosecutor to prepare her witness to be cross-examined on the statement. (Tr. at 61.) But given the summary's references to Norma's discussion with the prosecutor related to her refusal to talk to the defense investigator it could also have been helpful to "advance th[e] case and resolve it

short of a trial," which, in light of the ultimate outcome of the trial, may have been beneficial to Zachary. *Id.* at 62. In these circumstances, tendering the investigative summary to the prosecution in advance of the trial was not ineffective representation, but rather, a legitimate strategy.

### 2. Asking Officer Questions about Contents of "Lethality Screen"

{¶ 35} During cross-examination of one of the police officers called as a witness by the State, Zachary's counsel questioned the officer about a standard domestic violence report she filled out known as a "lethality screen." *Id.* at 110-11. Zachary's counsel was able to elicit that Norma had said "no" to the question of whether she thought Zachary might kill her. *Id.* But opening up testimony about the report the trial court gave the prosecution latitude to ask questions about the report on redirect and place before the jury other potentially damaging information in the form of Norma's affirmative responses to questions about other aggressive things Zachary had done and threatened. *Id.* at 118-19. Following that, Zachary's counsel went over the remaining responses on the form with the police officer, and he was able to elicit Norma's negative answers about whether Zachary had done things like tried to kill himself, spied on her, or left threatening messages. *Id.* at 120-21. Defense counsel's questioning also revealed that Zachary was not employed, according to Norma's answers on the form. *Id.* This could have been significant to the jury as a barometer of Norma's credibility, since Norma testified that Zachary had been drinking with his friend from work before he hit her. *Compare id.* at 120-21 *with id.* at 28.

{¶ 36} Defense counsel's questions about the "lethality screen" both helped and hurt Zachary's defense. While things for the most part look different in hindsight, at the time of trial Zachary's defense counsel's questions about the "lethality screen" were a legitimate strategic decision and not deficient performance. *See Roush* at ¶ 37, quoting *Strickland* at 689; *Michel* at 101.

### 3. Whether the Fact that the Trial Court Cautioned Counsel Means that Counsel was Ineffective

{¶ 37} The trial court cautioned defense counsel at several junctures during trial about counsel's demeanor and tone. Concerning a duty to disclose to the prosecution, the recorded attempt by the defense investigator to interview the victim, the trial court said:

> I am just amazed at the kind of flippant way in which we are having this conversation. You almost seem to suggest that because you provided the case law five months ago that she should not be raising an objection today. I am flabbergasted.

(Tr. at 59.) Defense counsel argued that police witnesses who appeared as witnesses at trial had testified about what witnesses had told them. Counsel stated that he should be able to ask similar questions of the police witness he called. The trial court responded:

> I have been here. I get that. You don't have to talk down to me. I got a law license too. Everybody has a license here.

*Id.* at 151. Finally, when defense counsel apparently tossed his tablet onto defense counsel table after finishing questioning, the trial court excused the jury and then said the following:

> Let me say this, Mr. [Defense Counsel]. You may not like my rulings, but I don't do tablet tossing. I don't do statements that are in my opinion disrespectful or allow behaviors that are disrespectful to this court.
>
> I have been incredibly patient. I have tolerated a lot that I have seen because I do not want to in any way jeopardize Mr. Houston's standing with this jury. But because you don't like the way that I rule, you don't have the luxury or the option of tossing your tablet on counsel table when you have completed questioning. I am over it. Do you understand what I am saying?

*Id.* at 154.

{¶ 38} The transcript we have reviewed does not describe nuances like tone or body language that the trial judge apparently found offensive. Nor does it capture what, other than the tablet-toss, defense counsel may have done to earn the apparent ire of the trial court. But even if we assume for the sake of argument that defense counsel's attitude somehow constituted deficient performance under *Strickland*, we cannot discern, and Zachary's brief does not explain, why the result would have been different had counsel not employed the mannerisms that apparently annoyed the judge. *State v. Griffin*, 10th Dist. No. 10AP-902, 2011-Ohio-4250, ¶ 42, quoting *Bradley* at paragraph three of the syllabus (" 'To show that a defendant has been prejudiced by counsel's deficient performance, the

No. 16AP-157

defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different.' ").

{¶ 39} Zachary's first assignment of error is overruled.

## D. Second Assignment of Error—Whether the Trial Court Should Have Instructed on the Lesser-Included Offense of Disorderly Conduct

{¶ 40} Zachary argues that disorderly conduct is a lesser-included offense of domestic violence and, on the facts of this case, it was error for the trial court to have failed to give an instruction on that offense when he requested it. (Zachary Brief at 9-11.) "Requested jury instructions should ordinarily be given if they are correct statements of law, if they are applicable to the facts in the case, and if reasonable minds might reach the conclusion sought by the requested instruction." *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, ¶ 240, citing *State v. Griffin*, 141 Ohio St.3d 392, 2014-Ohio-4767, ¶ 5; *Murphy v. Carrollton Mfg. Co.*, 61 Ohio St.3d 585, 591 (1991). We review such issues for abuse of discretion. *Adams* at ¶ 240, citing *State v. Wolons*, 44 Ohio St.3d 64, 68 (1989). However, "no court has the authority, within its discretion, to commit an error of law." *JPMorgan Chase Bank, N.A. v. Liggins*, 10th Dist. No. 15AP-242, 2016-Ohio-3528, ¶ 18, quoting *State v. Akbari*, 10th Dist. No. 13AP-319, 2013-Ohio-5709, ¶ 7, citing *State v. Beechler*, 2d Dist. No. 09-CA-54, 2010-Ohio-1900, ¶ 70.

{¶ 41} It is a question of law whether disorderly conduct is a lesser-included offense of domestic violence.[2] *State v. Deanda*, 136 Ohio St.3d 18, 2013-Ohio-1722, ¶ 6 (calling the inquiry a "purely legal question"). To determine whether one offense is a lesser-included offense of another requires the following analysis:

> [A] court shall consider whether one offense carries a greater penalty than the other, whether some element of the greater offense is not required to prove commission of the lesser offense, and whether the greater offense as statutorily defined cannot be committed without the lesser offense as statutorily defined also being committed.

*State v. Evans*, 122 Ohio St.3d 381, 2009-Ohio-2974, ¶ 26; *see also* R.C. 2945.74; Crim.R. 31(C). When there are multiple statutorily defined alternative ways of committing a greater offense, whether the greater offense cannot be committed without also

---

[2] We note that the State did not contest this point in the trial court. (Tr. at 97-98.) But it is an issue of law appropriate for discussion and analysis.

No. 16AP-157

committing the lesser offense must be considered as to each of the alternative ways to commit the greater offense. *State v. Smith*, 117 Ohio St.3d 447, 2008-Ohio-1260, paragraph one of the syllabus. If at least one alternative of the greater offense cannot be committed without also committing the lesser offense, as to that alternative the analysis concerning the lesser offense is satisfied. *Id.* at ¶ 28.

{¶ 42} Because of Zachary's repetitive crimes of domestic violence, this particular incident was indicted as domestic violence, a third-degree felony and punishable by up to 36 months in prison. R.C. 2919.25(A), (D)(4); 2929.14(A)(3)(b). Disorderly conduct may be a minor misdemeanor, but at most, a fourth-degree misdemeanor, and it is not punishable by any term of imprisonment. R.C. 2917.11(A)(1), (E)(2), (E)(3)(a); 2929.26(D). The offense of domestic violence carries a greater penalty and is thus the "greater" offense (as opposed to the "lesser offense").

{¶ 43} Domestic violence also requires proof of other elements not present in the offense of disorderly conduct. The Ohio Revised Code prohibits disorderly conduct such that:

> No person shall recklessly cause inconvenience, annoyance, or alarm to another by doing any of the following:
>
> (1) Engaging in fighting, in threatening harm to persons or property, or in violent or turbulent behavior.

R.C. 2917.11(A)(1). Domestic violence requires proof that a person "knowingly cause[d] or attempt[ed] to cause physical harm to a family or household member." R.C. 2919.25(A). The required mental state for the commission of domestic violence is "knowingly" as opposed to "recklessly" for disorderly conduct. Domestic violence requires "physical harm" while disorderly conduct must result in "inconvenience, annoyance, or alarm." The object of domestic violence is a "family or household member" rather than simply, "another" for disorderly conduct. *Compare* R.C. 2919.25(A) *with* 2917.11(A)(1).

{¶ 44} It is axiomatic that committing assault also involves committing disorderly conduct. This Court has reasoned:

> Because a person will necessarily cause inconvenience, annoyance or alarm to another by causing or attempting to cause them physical harm, and because recklessly is a lesser

> mental state than knowingly, assault cannot be committed without also committing disorderly conduct.

*State v. Keith*, 10th Dist. No. 08AP-28, 2008-Ohio-6122, ¶ 32, citing *State v. Heffner*, 2d Dist. No. 16230 (June 6, 1997); *State v. Roberts*, 7 Ohio App.3d 253, 254 (1st Dist.1982). "Assault" is in relevant part "knowingly caus[ing] or attempt[ing] to cause physical harm to another." R.C. 2903.13(A). Domestic violence is in relevant part "knowingly caus[ing] or attempt[ing] to cause physical harm to a family or household member." R.C. 2919.25(A).

{¶ 45} Domestic violence in R.C. 2919.25(A) is essentially assault with the added element that the person assaulted is a "family or household member." Since committing assault necessarily involves the commission of disorderly conduct, committing domestic violence (a nuanced form of assault) also involves committing disorderly conduct. *See Cleveland Heights v. Cohen*, 8th Dist. No. 101349, 2015-Ohio-1636, ¶ 46 (noting similarities between assault and domestic violence and concluding that the similarities provide support for the view that disorderly conduct is a lesser included of domestic violence); *see also State v. Juntunen*, 10th Dist. No. 09AP-1108, 2010-Ohio-5625, ¶ 10 (remarking that the jury found the defendant "guilty of domestic violence and the lesser included offense of assault").

{¶ 46} We hold that disorderly conduct as set forth in R.C. 2917.11(A)(1) is a lesser-included offense of domestic violence as set forth in R.C. 2919.25(A). In so holding, we note that, although there are some differences of opinion on this issue in Ohio, our view is the majority view and tends to comport with the updated test determined by the Supreme Court and set forth in *Evans* at ¶ 26. *Compare Cohen* at ¶ 38; *In re S.W.*, 2d Dist. No. 24525, 2011-Ohio-5291, ¶ 37; *State v. Maynard*, 4th Dist. No. 10CA43, 2012-Ohio-786, ¶ 27; *State v. Golding*, 11th Dist. No. 2008-L-049, 2009-Ohio-1437, ¶ 41; *State v. Berry*, 12th Dist. No. CA2006-11-133, 2007-Ohio-7082, ¶ 20; *with State v. Poppe*, 3d Dist. No. 2-04-40, 2006-Ohio-1994, ¶ 31-32, citing *State v. Schaefer*, 2d Dist. No. 99 CA 88 (Apr. 28, 200); *State v. Blasdell*, 155 Ohio App.3d 423, 2003-Ohio-6392, ¶ 16-23 (7th Dist.), citing *Schaefer*; *see also Cleveland v. Hall*, 8th Dist. No. 101820, 2015-Ohio-2698, ¶ 35-40 (distinguishing *Blasdell* and *Schaefer* as predating *Evans*); *In re S.W.* at ¶ 29-37 (explaining that *Evans* undermined *Schaefer*). The Supreme Court has held that disorderly conduct is a lesser-included offense of domestic violence although the

particular alternative form of domestic violence at issue was the prohibition that "[n]o person by threat of force, shall knowingly cause a family or household member to believe that the offender will cause imminent physical harm to the family or household member." *Shaker Heights v. Mosely*, 113 Ohio St.3d 329, 2007-Ohio-2072, ¶ 6; R.C. 2919.25(C). But all of this is not dispositive of the question presented by Zachary's assignment of error: Should the trial court have instructed the jury on the lesser-included offense of disorderly conduct?

{¶ 47} "[T]he mere fact that an offense is a lesser included offense of a charged offense does not mean that the court must instruct on both offenses." *Keith* at ¶ 35, citing *State v. Wilkins*, 64 Ohio St.2d 382, 387 (1980); *State v. Easley*, 10th Dist. No. 07AP-578, 2008-Ohio-468, ¶ 59.

> "Even though an offense may be statutorily defined as a lesser included offense of another, a charge on such lesser included offense is required only where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction upon the lesser included offense." *State v. Thomas*, 40 Ohio St.3d 213, 533 N.E.2d 286, paragraph two of the syllabus. In making this determination, the court must view the evidence in a light most favorable to defendant. *State v. Smith* (2000), 89 Ohio St.3d 323, 331, 2000 Ohio 166, 731 N.E.2d 645; *State v. Wilkins* (1980), 64 Ohio St.2d 382, 388, 18 O.O.3d 528, 415 N.E.2d 303.

*State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, ¶ 133.

{¶ 48} Concerning Zachary's indictment for domestic violence, the key question is whether the jury could have found that Zachary did not "knowingly cause or attempt to cause physical harm to" Norma but did "recklessly cause inconvenience, annoyance, or alarm to" Norma by "threatening harm," or "in violent or turbulent behavior." R.C. 2919.25(A); 2917.11(A)(1); *see also* R.C. 2901.01(A)(3) (defining "physical harm" as "any injury, illness, or other physiological impairment, regardless of its gravity or duration").

{¶ 49} Norma testified that at one point, while arguing, Zachary jumped on her and hit her in the head and in the face with a closed fist. (Tr. at 32, 34). She said the same thing in a somewhat hysterical 911 call shortly after the altercation occurred. (Tr. at 39-42; State's Ex. A.) Norma identified herself and her claimed injuries, including a black eye, in photographs introduced at trial. (Tr. at 45; State's Ex. B.) A police officer testified

that Norma appeared upset when they arrived at Norma and Zachary's home and stated without hearsay objection that Norma conveyed she had been threatened and hit by her husband. (Tr. at 104). The officer personally observed injuries and swelling to Norma's face that night. *Id.* at 106. The photographs in the record of the trial appear to show some redness, swelling, and bruising, although not distinct. (State's Ex. B.) (Norma admitted that her eyes always look like they have black circles under them. *Id.* at 85.)

{¶ 50} Defense counsel has argued that only after the police twice visited and twice failed to take Zachary away, did Norma claim Zachary had hit her. (Tr. at 30-34). Viewing all of the evidence in the light most favorable to Zachary (as *Conway* requires), a jury could not have reasonably concluded that Zachary did not hit Norma. *Conway* at ¶ 133. In other words, the evidence presented at trial would not "reasonably support both an acquittal on the crime charged and a conviction upon the lesser included offense." *Id.*, quoting *Thomas* at paragraph two of the syllabus.

{¶ 51} We thus overrule Zachary's second assignment of error.

## IV. CONCLUSION

{¶ 52} Zachary's conviction for domestic violence was not against the manifest weight of the evidence and was supported by sufficient evidence. The evidence at trial did not ultimately prove that the prosecutor instructed a witness not to talk to the defense. The decision to share an interview summary and question a witness about a "lethality screen" were matters of strategy, not instances of ineffective assistance, and the mere fact that the trial court cautioned defense counsel (with no demonstration from the transcript of ill demeanor of defense counsel aside from tossing notebook equipment onto the desk) does not support ineffective assistance by defense counsel. And though disorderly conduct as set forth in R.C. 2917.11(A)(1) is a lesser-included offense of domestic violence as set forth in R.C. 2919.25(A), the trial court did not abuse its discretion in failing to instruct on the lesser-included offense. This is because, on the facts of this case, the jury could not have reasonably concluded that Zachary did not commit domestic violence. Accordingly, we overrule each of Zachary's assignments of error and affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

LUPER SCHUSTER and HORTON, JJ., concur.

————————